J-S41011-16

2016 PA Super 214

COMMONWEALTH OF PENNSYLVANIA,

Appellee

v.

KEVIN GREEN,

Appellant

IN THE SUPERIOR COURT OF
PENNSYLVANIA

No. 2672 EDA 2014

Appeal from the Judgment Entered September 12, 2014
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0011053-2013

BEFORE:  BENDER, P.J.E., DUBOW, J., and STEVENS, P.J.E.[*]

DISSENTING OPINION BY BENDER, P.J.E.:      **FILED SEPTEMBER 16, 2016**

Based on the evidence presented at Appellant's trial, I disagree with the Majority that Appellant confined the two victims in a place of isolation. Accordingly, I respectfully dissent.

Appellant primarily relies on two cases in challenging his kidnapping conviction, **Commonwealth v. Hook**, 512 A.2d 718 (Pa. Super. 1986), and **Commonwealth v. Rushing**, 99 A.3d 416 (Pa. 2014).  Appellant maintains that his case is analogous to **Hook** and distinguishable from **Rushing**.  After review of those cases, and for the reasons that follow, I would agree.

First, in **Hook**, the appellant forced his way into Doris Pyle's second-floor apartment, but, after a brief struggle, she was able to escape into an

_____

[*] Former Justice specially assigned to the Superior Court.

elderly neighbor's apartment. ***Hook***, 512 A.2d at 719. The appellant followed, threw both women onto a bed, and sexually assaulted Pyle before passing out due to his intoxication. ***Id.*** The elderly neighbor, Thelma Maust, ran to a clothing store on the first floor of the building, which was open at the time of the incident, and called police. ***Id.*** Police arrived a few minutes later and arrested the appellant, who was still passed out in Maust's apartment. ***Id.***

Ultimately, the appellant was convicted of two counts of kidnapping, but on appeal, this Court reversed those convictions, reasoning that the evidence failed to demonstrate that the appellant had confined his victims "in a place of isolation." ***Id.*** at 720. We stressed that Pyle's apartment was accessible to the public, as demonstrated by the appellant's presence at her door. We also relied on the fact that Pyle was expecting an employee of a dry cleaning company to arrive at any moment for a pick up, and that Maust's family had visited her apartment earlier that day. ***Id.*** Additionally, the police arrived on scene within minutes of receiving Maust's call made from the clothing store, to which Maust had run for help after the appellant passed out. ***Id.*** In sum, we concluded that these facts did not prove that Pyle and Maust were "confined in a manner that made discovery or rescue unlikely[,]" and it appeared that "any confinement [the] appellant imposed on the victims was incidental to his attempt to rape at least one of the victims." ***Id.***

Appellant contends that, as in **Hook**, the confinement of the victims in this case was not in a place of isolation, and was merely incidental to the robbery. He stresses that during the entire incident, "the home was unlocked and open to persons coming and going[,] including [Elizabeth] Varela herself, her neighbor Ronald Martin and her husband José Torres." Appellant's Brief at 21 (citation to the record omitted). Appellant points out that Mr. Martin, Mr. Torres, and the police arrived at the home shortly after Appellant and his cohort fled, thus demonstrating that the circumstances were not such as to make the discovery or rescue of the victims unlikely. He further claims that once he and his cohort left the home, "the victims were able to move about, because … it was only their hands which were bound." **Id.** at 25. In sum, Appellant concludes that, "[t]hese circumstances simply [do] not rise to the level of a confinement for a substantial period in a place of isolation as required by the statute." **Id.** at 22.

I agree with Appellant. Notably, in this case, the victims' home was located in close proximity to other houses, including Mr. Martin's neighboring residence. Moreover, as in **Hook**, the victims' home was also accessible to the public, at least to the extent that Appellant and his female companion were able to approach the victims' door and knock at approximately 12:30 in the afternoon without hindrance. Additionally, Ms. Varela testified that when Appellant and his female cohort returned to her house without Mr. Torres, the door to her home was unlocked, allowing Appellant and his companion to walk right in. N.T. Trial, 7/9/14, at 62-63.

- 3 -

I also find it significant that Ms. Varela and her son, Joshua, were only bound at the hands when Appellant fled, and there was no evidence demonstrating that they could not have been heard had they screamed for help, or that they could not have gotten themselves outside or to a window to yell for assistance. It was simply that the victims had no need to do so, as Mr. Martin was able to enter their home and immediately come to their aid after he witnessed Appellant and his female companion fleeing. Additionally, while the facts of **Hook** suggest that the victims in that case lived alone, here, Mr. Torres *resided in the home* with the victims, and left only to show Appellant and his female companion a rental apartment. No evidence produced at trial suggested that Mr. Torres would not be returning to the home at some point that day. Indeed, Mr. Torres did arrive home just minutes after Appellant fled the scene, and only shortly after Mr. Martin entered the home and found the victims. In my view, the fact that help arrived to rescue the victims just minutes after Appellant left the scene weighs strongly in favor of an inference that the home was not 'a place of isolation.'

Secondly, I agree with Appellant that the facts of his case are in stark contrast to the evidence found sufficient to demonstrate 'a place of isolation' in **Rushing**. There, Rushing held multiple victims (many of whom were family members) together inside a home for at least two hours, during which "the victims were handcuffed and bound, threatened repeatedly to be quiet,

one was sexually assaulted, and all were placed in great fear." ***Rushing***, 99 A.3d at 426.

> Specifically, [one victim,] Cynthia Collier, while attempting to telephone for help, was handcuffed behind her back, forced onto the floor of her son's bedroom, threatened at gunpoint with death if she did not shut up, endured hearing [another] son[,] Dustin[,] being murdered by blows from a hammer, was frequently checked on, and was threatened to be silent if she wanted to live, especially upon [her daughter's] arrival to the home. Both Cynthia and her son Matthew, who was also bound, remained restrained while [Rushing] stole their bank cards and a ring from Cynthia's finger. Repeatedly returning to check on Cynthia and Matthew, [Rushing] only later in the ordeal indicated that Wes Collier would be the next person in the home, and that they could yell for assistance at that time, and then, after considering the time, informed them that they could do what they wanted if [Rushing] was not back by 6:30 a.m. Similarly, [Rushing] confined Matthew, even though handicapped and using a wheelchair, to a bed by tying his hands and legs, rendering him unable to seek assistance by escape or telephone. Again, Matthew was checked on multiple times to prevent his escape or calls for assistance during the early morning events.

> Finally, with respect to [another victim,] Samantha, upon her arrival at the home, she was directed into her bedroom, shown the dead body of her son's father [(Justin Berrios, whom Rushing had murdered earlier in the night)], forced onto her stomach at gunpoint while her hands were tied behind her back and her feet bound with a cable. She was forced to remain on her bed under threat of rape, indecently assaulted, was checked on multiple times, and her cell phone was removed, and then thrown on Justin's dead body. Samantha's car keys were taken, and [Rushing] indicated that he had already killed, and would kill more individuals if the police did not find him. Samantha was bound such that she could not free herself and was only able to call for assistance after retrieving her phone from Justin's dead body and dialing with her toe, reaching the police only after numerous attempts.

***Id.***

In concluding that these egregious facts were sufficient to demonstrate that the victims were confined in 'a place of isolation,' our Supreme Court stated:

> In short, while confined in their own home, the victims were nevertheless tightly bound and unable to seek discovery or rescue. Indeed, the victims were threatened with death if they attempted to obtain help from neighbors or the police. There is no evidence that others had access to the home, other than Wes, whose return was expected, but the time of his arrival was uncertain and not imminent. Rather than being incidental to the other crimes, [Rushing's] confinement of the victims was with the intent to commit those other crimes, and to facilitate [his] escape. Thus, based upon these facts, we believe the Commonwealth established that the victims were confined in a place of isolation which rendered them separated from the normal protections of society in a fashion that made their discovery or rescue unlikely, thus satisfying the requirements of the kidnapping statute.

*Id.* at 426-27.

While here, Appellant certainly placed his victims in significant fear by his conduct, he did not physically assault, threaten, or force them to endure mental anguish comparable to that imposed by Rushing on his victims. Also, in contrast to Rushing's early morning attack, here Appellant's confinement of the victims occurred in the middle of the afternoon, and in a place where other homes, such as Mr. Martin's, were in close proximity. Despite this broad-daylight confinement, and close proximity of other people, Appellant did not threaten the victims to discourage them from seeking rescue. He also did not tape their mouths to prevent them from screaming for help, or bind their feet to inhibit them from moving outside or to a window to seek

rescue. *See Commonwealth v. Markman*, 916 A.2d 586 (Pa. 2007) (concluding the victim was confined in a place of isolation where Markman brought the victim to the living room of a trailer in a trailer park, and then "bound [the victim's] hands and feet, placed a cloth rag into her mouth, and gagged her so that she could not cry out").

Moreover, I again stress that Mr. Torres lived in the victims' home, thus ensuring that he would at some point return. Unlike the returning family member in *Rushing*, the evidence indicated that Mr. Torres' return was imminent. Namely, Mr. Torres left his home on 5th Street in order to show Appellant and his female companion a nearby apartment on 6th Street. N.T. Trial, 7/9/14, at 116-117.[1] Mr. Torres testified that he told Appellant that he would wait in the 6th Street apartment for "about an hour[]" while Appellant went to get rent money. *Id.* at 120. There was no evidence suggesting that Mr. Torres planned to travel to any location after his visit to the 6th Street apartment and before returning to the home he shared with the victims. Additionally, not only was Mr. Torres' arrival assured and

_____

[1] Mr. Torres stated that the 6th Street apartment was "about 5, 10, 15" minutes away from his home by foot, and "maybe two minutes … [or] three minutes" by car. N.T. Trial, 7/9/14, at 117. Mr. Torres also testified that he "took" Appellant to the 6th Street apartment, but he did not state whether they walked or drove. Thus, the evidence demonstrated that Mr. Torres was no more than 15 minutes away from the home where the victims were confined during the course of the robbery. I also note that Ms. Varela testified that her husband arrived at the house about "five minutes" after Appellant and his cohort fled. *Id.* at 73.

- 7 -

imminent, Mr. Martin was also able to access the victims' home and rescue them *immediately* after seeing Appellant and his female cohort flee. Nothing in the record suggests that Mr. Martin struggled to gain entry to the home, or had difficulty locating the victims inside.

In sum, I agree with Appellant that the facts of this case are distinguishable from **Rushing**, and are closely aligned with **Hook**. So much so, in fact, that I believe the Majority's decision is effectively overruling **Hook**, which is beyond this panel's authority to do. **See Commonwealth v. Beck**, 78 A.3d 656, 659 (Pa. Super. 2013) (concluding that a three-judge panel of this Court may not overrule a previously published opinion by this Court). In my view, Appellant did not separate the victims from the normal protections of society in a manner that made their discovery or rescue unlikely. Thus, I would hold that the evidence was insufficient to demonstrate that Appellant confined the victims in a 'place of isolation,' a required element of the offense of kidnapping. Consequently, I would reverse Appellant's two kidnapping convictions.[2]

---

[2] I note that I agree with the Majority's well-reasoned analysis of Appellant's other two issues.