J-S40025-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| BRIAN THOMAS BARNETT | : | |
| | : | |
| Appellant | : | No. 2027 EDA 2023 |

Appeal from the Judgment of Sentence Entered July 17, 2023
In the Court of Common Pleas of Chester County Criminal Division at
No(s): CP-15-CR-0000279-2021

BEFORE: STABILE, J., McLAUGHLIN, J., and LANE, J.

MEMORANDUM BY McLAUGHLIN, J.:             **FILED JANUARY 30, 2025**

Brian Thomas Barnett appeals from the judgment of sentence following his convictions for burglary, use or possession of electric incapacitation device, disarming law enforcement officer, resisting arrest, criminal trespass, firearms not to be carried without a license, and two counts of aggravated assault.[1] Barnett challenges the sufficiency of the evidence to support the burglary, aggravated assault, and firearms convictions. We reverse the judgment of sentence for firearms not to be carried without a license. We affirm the judgment of sentence for all other convictions and remand for resentencing.

At Barnett's March 2023 bench trial, Barnett's sister, Jennifer Barnett-Quattlebaum, testified that on December 13, 2020, Barnett called her and asked where their father was. N.T., Mar. 15, 2023, at 11-12. Barnett-

_____

[1] 18 Pa.C.S.A. §§ 3502(a)(1)(i), 908.1(a)(1), 5104.1, 5104, 3503(b)(1)(i), 6106(a), and 2702(a)(3), respectively.

Quattlebaum did not respond. *Id.* at 12. Barnett then said, "Well, I need gas money. I'm coming to your house to get it." *Id.* Barnett-Quattlebaum testified that she told Barnett she would not give him money, and he said, "Well, I'm going to get gas money from [D]ad." *Id.* She testified that Barnett arrived at her house and was "very demanding and saying that, . . . 'I know that [D]ad's there even though you didn't answer me.'" *Id.* She stated that Barnett said he was going to get the gas money from their father, and "he's going to give it to me today, and I'm not going home." *Id.* Barnett-Quattlebaum testified she told Barnett it was not a good time or good idea, but Barnett "[v]ery forcefully" said, "Nope, I'm going to come. I'm going to get that money and he's going to give it to me." *Id.* Barnett-Quattlebaum testified that she kept her father's location a secret to protect her father because "the week before that there [had been] an incident that occurred." *Id.* at 13.

Barnett-Quattlebaum stated that when Barnett arrived at her house, she opened the door just enough to see his face and told him to go home. *Id.* at 15. She said that Barnett repetitively asked where their father was and whether their father was in the house, and he refused to leave. *Id.* She testified Barnett pushed the door open and put his hand inside, at which point Barnett-Quattlebaum's husband came over and they pushed the door to try to get him out. *Id.* at 16. She stated that Barnett "pushed the door very forcefully" so that Barnett-Quattlebaum and her husband were pushed back. *Id.* After several attempts, they got him back outside. *Id.* She testified that she called the police. *Id.* at 17. Barnett-Quattlebaum testified that when they

were outside, she told him to go home, and "[a]t one point he pull[ed] up his shirt and was like, I'm going to get in your house. I know [D]ad is in there and you're hiding him." *Id.* at 18. She testified that she saw "in the front of his pants . . . two handles which were a knife and a gun." *Id.* Barnett-Quattlebaum testified that she felt "[w]orried, nervous, upset, scared," because she "didn't know what to expect from him." *Id.* at 20.

Barnett-Quattlebaum testified that at one point during the struggle, her father came downstairs. *Id.* at 21. She stated that she yelled at her father to go back upstairs and that Barnett had a weapon. *Id.* at 22. She testified that her father offered Barnett money and said, "Just stop. Go home." *Id.* at 28. She testified her father did not go upstairs immediately, but did go after she screamed it a few times. *Id.* at 22.

Barnett-Quattlebaum testified that when the police arrived, she briefly explained that they had had a fight, Barnett had been trying to get in her house, and Barnett threatened her with a weapon. *Id.* at 23. She said that the police asked Barnett what happened, and he said he was there to see his father and then ran "to the other side of the house" and across the neighbor's yard. *Id.* at 24. She testified the police caught him "about two houses up in the middle of the street." *Id.* She stated that when the police caught up with Barnett, there was a struggle and Barnett was trying to flee, and Barnett wrestled the cops. *Id.* She stated that other officers arrived and "there's other cops rushing in and parking and running up to them. So it's a whole big crowd

of cops in the street surrounding him, and he's still fighting." *Id.* at 25. She testified that her brother was a former wrestler and rugby player. *Id.*

Detective James Chieffo testified that on December 13, 2020, he and Officer Jennifer Schreiber were working a patrol shift and were dispatched to a domestic dispute with a suspect armed with a knife. *Id.* at 62-63. When he arrived, he saw Barnett-Quattlebaum and her husband standing outside their residence in a "defense posture where they were in fear for their own safety" and Barnett standing in front of them. *Id.* at 64. Detective Chieffo testified that he approached Barnett, who backed away, turned, and ran. *Id.* at 64-65. He stated that he and Officer Schreiber chased Barnett, and he told Officer Schreiber to deploy her taser. *Id.* at 65. He testified that it appeared both prongs of Officer Schreiber's taser struck Barnett, but it did not have an effect. *Id.* Detective Chieffo testified he caught up to Barnett in the street and a "tussle occurred." *Id.* He testified that as he was grabbing Barnett's hoodie, Barnett pulled back and Detective Chieffo's left foot and leg bent underneath him. *Id.*

Detective Chieffo said he realized he was injured, looked up, and saw Officer Schreiber struggling with Barnett. *Id.* at 66. He stated he jumped up and grabbed Barnett and was able to take him to the ground. *Id.* He testified that Barnett did not comply with orders to put his hands behind his back. *Id.* Detective Chieffo testified he was trying to keep Barnett's hands away from his waist area because he knew Barnett had a knife. *Id.* He told Officer Schreiber to deploy her stun gun, which she did, but it did not have any effect

- 4 -

on Barnett. ***Id.*** He testified that Officer Schrieber then told him that Barnett had the taser. ***Id.*** Detective Chieffo testified that he saw Barnett's hand in control of the taser, and he grabbed Barnett's hand to try to "smash it, grab it, keep hitting his hand on the ground getting him to drop the taser and he didn't." ***Id.*** at 66-67. Barnett nonetheless raised the taser in Officer Schreiber's direction. ***Id.*** at 67. Detective Chieffo testified that "[o]nce backup arrived it took several officers to subdue [Barnett] and put handcuffs on him." ***Id.*** at 68. Detective Chieffo testified that one of the officers was able to dislodge the taser from Barnett's hand, and during the "tussle," Barnett's shirt lifted and the officers found a firearm in his waistband. ***Id.*** at 69.

Detective Chieffo testified that he described the encounter as a fight because "[t]here was no complying[.]" ***Id.*** He said, "The fact that [Barnett] had disarmed or taken Officer Schreiber's [taser] from her and had that pointed in her direction and was not complying, that was not a simple resisting arrest. That was willing to do whatever he had to." ***Id.*** He further testified that while resisting, Barnett was trying to get to his waist, and the detective feared he was trying to reach for a weapon because he knew Barnett had a knife. ***Id.*** at 71.

Detective Chieffo testified that he sustained a torn ligament in his left ankle that did not heal and he has had numerous surgeries and procedures in his ankle. ***Id.*** He also had pain nerve block injections in his foot and spinal cord. ***Id.*** He was diagnosed with complex regional pain syndrome, "which is an injury to the nerve that runs down into [his] foot." ***Id.*** at 71-72. He has a

spinal cord stimulator, which helps control the nerve pain. *Id.* at 72. He testified that he can no longer be a police officer, does not think he can do other work in the foreseeable future, and uses a cane to walk. *Id.*

Detective Chieffo testified that Barnett pushed and shoved him and "continued physical contact the whole time." *Id.* at 74. The detective stated that "[t]here was aggression behind trying to get away," noting "the pushing and the shoving and then the down on the ground trying to get his hands behind his back." *Id.* at 76. Detective Chieffo explained, "The force that he was using to prevent that from happening was probably the most resistance of force that I've had in some time in my career, if ever." *Id.*

Officer Jennifer Schreiber testified that Detective Chieffo made contact with Barnett first. *Id.* at 102. She stated she observed a "knife sheath type landing off [Barnett's] right hip area in front of the hip area[.]" *Id.* She testified Barnett backed away, and then turned and ran from the officers. *Id.* She stated she tased Barnett "directly in the back," and although she believed both prongs made contact, she did not observe any effect on Barnett. *Id.* at 103. She stated she tried to get Barnett's hands above his body, and Barnett was pushing himself off the ground and "appeared [to be] slamming Detective Chieffo on the ground," and she then used the "dry stun"[2] portion of the taser

_____

[2] Officer Schreiber explained that a "dry stun" is where the cartridge is out of the taser and the taser has only electrical connection, so that "when you press down . . . the front of the barrel essentially of the taser is what tased them." N.T., Mar. 15, 2023, at 106.

in Barnett's back area. *Id.* at 105-06. She again observed no effect on Barnett. *Id.* at 107.

Officer Schreiber testified that Barnett seized the taser from her. *Id.* She said that she was able to maintain some contact with it and shoved his hand back on the asphalt, as she attempted to get the taser back. *Id.* She testified that as they were fighting over the taser, Barnett deployed it and shocked her hand. *Id.* She stated she finally was able to "forcefully twist" the taser out of his hand, and, after it was removed, Barnett attempted to reach back to his waistband. *Id.* at 110. She stated she knew he had a knife on him and believed he could have other weapons. *Id.* She testified that after back-up arrived, she was able to handcuff Barnett and, as she was doing so, his shirt lifted and she saw the holster for the knife and a firearm. *Id.* at 112.

Barnett's father, Thomas Draper, testified for the defense. He stated he was living with his daughter on the night of the arrest. N.T., Mar. 20, 2023, at 11-12. He said he had been at his daughter's house for about two weeks, and prior to that he lived at his home with his wife and Barnett. *Id.* 11-13. Draper testified that his wife was hospitalized and he went to his daughter's house because he needed some time away from Barnett. *Id.* at 13. He stated that he came downstairs when Barnett was at the door because he "was going to . . . give him the money, whatever he wanted." *Id.* at 15. Draper testified that he knew Barnett was running out of money, because he had "put food and stuff on the table before [he] left, . . . and was worried about him." *Id.* at 16. He stated Barnett had not threatened to harm anyone that night. *Id.*

The parties stipulated that in December 2020, Barnett did not have a valid license to carry a firearm. N.T., Mar. 15, 2023, at 94-95; Exh. C-7. The defense admitted into evidence a gun license check that showed that a firearm license had been issued to Barnett in October 2016, was set to expire in October 2021, and had been updated twice. However, the printout also showed the license had been revoked twice, once on August 10, 2017 and again on February 1, 2018. N.T., Mar. 20, 2023, at 8.[3]

The trial court found Barnett guilty of the crimes listed above. It court sentenced him in all to six and a half to 13 years' incarceration. Barnett filed a timely appeal.[4, 5]

Barnett raises the following issues:

I. Was sufficient evidence presented to find [Barnett] guilty of burglary, 18 Pa.C.S.A. § 3502(A)(a)(i), considering the Commonwealth did not prove [Barnett] had the intent to commit a crime in the home?

---

[3] The exhibits from March 20, 2023 are not in the certified record. However, the court described the exhibit at trial and neither party disputes the contents of the exhibit.

[4] Counsel filed a petition to withdraw as counsel in the trial court, which the trial court granted. This Court remanded for a **Grazier** hearing. **See Commonwealth v. Grazier**, 713 A.2d 81 (Pa. 1998). The trial court clarified that when it granted the petition to withdraw it orally appointed the Public Defender as counsel, but the appointment was not docketed. It therefore concluded a **Grazier** hearing was unnecessary, reappointed the Public Defender, and ordered counsel to file a concise statement of matters complained of on appeal. Tr.Ct.Op., filed Sept. 20, 2023 at 1 (unpaginated).

[5] The trial occurred before the Honorable Louis Mincarelli. Judge Mincarelli left the bench prior to issuance of a Rule 1925(a) opinion. The case was reassigned to the Honorable Patrick Carmody, who issued an opinion.

II. Was sufficient evidence presented to find [Barnett] guilty of aggravated assault, 18 Pa.C.S.A. § 2702(A)(3), with respect to Detective Chieffo considering the Commonwealth did not prove [Barnett] had the intent to injure the detective's leg or, in the alternative, that [Barnett] attempted to cause bodily injury to Detective Chieffo?

III. Was sufficient evidence presented to find [Barnett] guilty of aggravated assault, 18 Pa.C.S.A. § 2702(A)(3), with respect to Officer Schreiber considering the Commonwealth did not prove [Barnett] had the intent to cause bodily injury the when the officer's hand was shocked or, in the alternative, that [Barnett] attempted to cause bodily injury to Officer Schreiber?

IV. Was sufficient evidence presented to show *mens rea* necessary to convict [Barnett] of firearms not to be carried without a license, 18 Pa.C.S. § 6106(A)(1), considering [Barnett] previously had a valid license to carry a firearm and the Commonwealth did not present evidence [Barnett] was notified the license was revoked at the time of the incident.

Barnett's Br. at 2.

Barnett challenges the sufficiency of the evidence. When reviewing a challenge to the sufficiency of the evidence, "our standard of review is *de novo* [and] our scope of review is limited to considering the evidence of record, and all reasonable inferences arising therefrom, viewed in the light most favorable to the Commonwealth as the verdict winner." ***Commonwealth v. Rushing***, 99 A.3d 416, 420-21 (Pa. 2014). Evidence is sufficient where it proves every element of the crime beyond a reasonable doubt. ***Commonwealth v. Webber***, 306 A.3d 921, 925 (Pa.Super. 2023). The Commonwealth may prove each element of a crime with wholly circumstantial evidence. ***Commonwealth v. Hall***, 199 A.3d 954, 960 (Pa.Super. 2018).

Barnett first argues that the evidence was insufficient to support the burglary conviction because the Commonwealth did not prove he had an intent to commit a crime in the home. He states that Barnett-Quattlebaum did not want Barnett entering her home and interacting with their father, but maintains that those facts "do not make this situation a [b]urglary." Barnett's Br. at 22. He claims there was "no evidence that [Barnett's] intent upon entry was to harm anyone inside the home," or that his intent "was to force or attempt to force his father to do anything once he gained access to the inside." *Id.* at 25. Barnett concedes that his sister's testimony showed that he "gained entry by force," but argues that "this alone . . . does not automatically give rise to intent to commit a crime inside." *Id.* He further maintains that Barnett-Quattlebaum's testimony that he said he was "going to get in the house regardless" did "not insinuate[e] he was going to commit a crime inside the house." *Id.* Barnett testified that his father came downstairs to offer Barnett money and that his father had voluntarily given him money in the past. In Barnett's view, the evidence only showed that he wanted to enter the residence to ask his father for money and that his father was offering money.

A person is guilty of burglary "if, with the intent to commit a crime therein, the person . . . enters a building or occupied structure . . . that is adapted for overnight accommodations in which at the time of the offense any person is present and the person commits, attempts or threatens to commit a bodily injury crime therein[.]" 18 Pa.C.S.A. § 3502(a)(1)(i). A "bodily injury crime" is defined as

An act, attempt or threat to commit an act which would constitute a misdemeanor or felony under the following:

Chapter 25 (relating to criminal homicide).

Chapter 27 (relating to assault).

Chapter 29 (relating to kidnapping).

Chapter 31 (relating to sexual offenses).

Section 3301 (relating to arson and related offenses).

Chapter 37 (relating to robbery).

Chapter 49 Subch. B (relating to victim and witness intimidation).

*Id.* at 3502(e).

The intent to commit a crime "may be established by the defendant's words or inferred from his conduct or from the attendant circumstances." *Commonwealth v. Russell*, 460 A.2d 316, 321-22 (Pa.Super. 1983). Pennsylvania courts have rejected "a *per se* assumption that evidence of a forced opening into an occupied structure automatically gives rise to an inference of intent to commit a crime inside." *Commonwealth v. Alston*, 651 A.2d 1092, 1094 (Pa. 1994) (emphasis omitted). Therefore, "more than merely breaking a door or window is required to support an inference of intent to commit a crime inside." *Id.* (emphasis omitted). Rather, we must apply a totality of the circumstances test to determine whether an intent to commit a crime existed. *Commonwealth v. Wilamowski*, 633 A.2d 141, 144 (Pa. 1993).

We conclude sufficient evidence supported the burglary conviction. Barnett arrived at the home when told not to come and then used force on

the individuals inside the home to gain entry. Barnett's physical confrontation with the homeowners as he forced the door open, coupled with the evidence that Barnett possessed weapons, supported a finding that he possessed an intent to commit a crime in the house.

In his second and third issues, Barnett challenges the aggravated assault convictions. He concedes there was sufficient evidence Detective Chieffo sustained bodily injury but argues the Commonwealth did not prove Barnett had caused the injury intentionally or knowingly. He claims that Detective Chieffo was injured when he pulled on Barnett's hoodie and Barnett pulled back, and argues there was no testimony Barnett attempted to cause, or was aware of, the injury. He points out that Barnett did not kick or stomp on Detective Chieffo's leg. He further maintains that Detective Chieffo did not see a knife or gun until Barnett was handcuffed, and Barnett did not pull out "any object . . . to threaten" anyone. Barnett's Br. at 34. Citing Detective Chieffo's testimony that he did not give Barnett an opportunity to reach for the knife, Barnett argues that the lack of opportunity means he did not take a substantial step to commit assault. He further argues that Detective Chieffo testified he prevented Barnett from using the taser and therefore Barnett could not have taken a substantial step when holding the taser.

Barnett adds that although Officer Schreiber testified that Barnett used the taser on her hand, Detective Chieffo testified Barnett had been unable to use it, and Officer Schreiber did not testify as to physical impairment as a result of being shocked. He notes that Officer Schreiber testified that Barnett

- 12 -

began to reach for his waistband and she thought he would shoot her, but points out that Detective Chieffo testified Barnett could not get to his waistband. He claims the Commonwealth thus failed to show Barnett had the intent to assault Officer Schreiber or took a substantial step towards causing her bodily injury. He maintains the struggle described was consistent with conduct encompassed by the resisting arrest statute.

Under the charged subsection, a person is guilty of aggravated assault if he "attempts to cause or intentionally or knowingly causes bodily injury to" a police officer "while in the performance of duty[.]" 18 Pa.C.S.A. § 2702(a)(3), (c)(1). Accordingly, to support the conviction, the Commonwealth must prove the defendant "(1) attempted to cause or intentionally or knowingly caused (2) bodily injury (3) to a police officer (4) in the performance of his duties." *Commonwealth v. Marti*, 779 A.2d 1177, 1180 (Pa.Super. 2001). "The Commonwealth need not establish the victim actually suffered bodily injury." *Commonwealth v. Hatch*, 314 A.3d 928, 932 (Pa.Super. 2024) (quoting *Commonwealth v. Richardson*, 636 A.2d 1195, 1196 (Pa.Super. 1994)). Rather, it need establish only an attempt to inflict bodily injury, which can be shown by "circumstances which reasonably suggest that a defendant intended to cause injury." *Id.* (citation omitted). For an attempt "it must be shown that the actor had a specific intent to cause bodily injury[.] A person acts intentionally with respect to a material element of an offense if it is his conscious object to engage in conduct of that nature or to cause such a result[.]" *Id.* (citation omitted) (alterations in *Hatch*).

- 13 -

Here, the Commonwealth presented evidence that Barnett fought the police officers with "aggression," taking Officer Schreiber's taser, and repeatedly reaching toward his waistband, which had a knife and gun. During the encounter Detective Chieffo sustained permanent injury and Officer Schreiber was tased in her hand. Based on the totality of the circumstances, the evidence supports a finding that Barnett intended to inflict bodily injury, as he engaged in conduct of the nature that would cause such a result. Detective Chieffo's testimony that he prevented Barnett from reaching his weapons does not mean that Barnett lacked the intent to use them. Both officers testified that Barnett attempted to reach his waistband, and Detective Chieffo and Officer Schreiber each testified as to their struggle with Barnett. Detective Chieffo in particular described the force used by Barnett as force that "was probably the most resistance of force that I've had in some time in my career, if ever." N.T., Mar. 15, 2023, at 76. The evidence supported a finding that Barnett had the intent to cause bodily injury to both officers.

In his last issue, Barnett argues the Commonwealth did not provide sufficient evidence to support the firearms to be carried without a license conviction. He stresses that he previously had a license to carry a firearm and the Commonwealth did not present evidence Barnett knew the license was revoked. Barnett notes the parties stipulated that he did not have a valid license to carry firearm issued under Section 6109 or valid sportsman firearm permit issued under Section 6106. However, he points out that he admitted into evidence a gun license check that indicated he had a valid license at one

point. The license was issued in October 2016 and expired in October 2021, and had two updates – one on August 10, 2017 indicating the license was revoked and one on February 1, 2018, again indicating the license was revoked. Barnett maintains the Commonwealth had to prove Barnett was given statutory notice of the revocation to prove he intentionally, knowingly, or recklessly carried the firearm. He argues it was error to rely on the passage of time to find he was aware. He argues the Commonwealth did not establish he received the statutory notice of revocation or any other evidence of notice. He maintains there was insufficient evidence that he intentionally, knowingly, or recklessly carried a firearm concealed on his person without a valid license.

Pursuant to Section 6106 a person cannot carry a firearm in his vehicle or concealed on his person without a "valid and lawfully issued license." 18 Pa.C.S.A. § 6106(a). The Commonwealth "must establish that a defendant acted 'intentionally, knowingly or recklessly' with respect to each element" of Section 6106. *Commonwealth v. Scott*, 176 A.3d 283, 291 (Pa.Super. 2017).

"A license to carry a firearm shall be for the purpose of carrying a firearm concealed on or about one's person or in a vehicle throughout this Commonwealth." 18 Pa.C.S.A. § 6109(a). Once a license has been issued, it may be revoked for good cause, and when revoked, notice of revocation must be sent in writing and by certified mail:

> A license to carry firearms may be revoked by the issuing authority for good cause. A license to carry firearms shall be revoked by the issuing authority for any reason stated in

- 15 -

subsection (e)(1) which occurs during the term of the permit. **Notice of revocation shall be in writing and shall state the specific reason for revocation. Notice shall be sent by certified mail to the individual whose license is revoked**, and, at that time, notice shall also be provided to the Pennsylvania State Police by electronic means, including e-mail or facsimile transmission, that the license is no longer valid. An individual whose license is revoked shall surrender the license to the issuing authority within five days of receipt of the notice. An individual whose license is revoked may appeal to the court of common pleas for the judicial district in which the individual resides. An individual who violates this section commits a summary offense.

*Id.* at § 6109(i) (emphasis added).

Here, the parties stipulated that Barnett did not have a license to carry a firearm at the time of the offense. Further, neither party disputes that Barnett had been issued a license to carry a firearm in October 2016 that was set to expire in October 2021, and that the license documentation had two notations of revocation, one on August 10, 2017 and one on February 1, 2018.

We conclude the Commonwealth failed to present sufficient evidence that Barnett acted intentionally, knowingly or recklessly regarding whether his license to carry a firearm had been revoked.[6] The evidence included a license

---

[6] At the trial, the trial court did not set forth its reasoning for finding Barnett guilty of carrying a firearm without a license. In the 1925(a) opinion, issued by a second judge, the court found Barnett liable based on the passage of time between the second revocation and the crime:

> The incident in question occurred just under two (2) years after the second update showing that the license was revoked. Based on the passage of time of almost two (2) years from the last update, it is reasonable to conclude that

*(Footnote Continued Next Page)*

set to expire in October 2021, with two notices of revocation. The Commonwealth presented no evidence that Barnett received notice of the revocation.

The Commonwealth claims that the evidence was sufficient because "[h]is license had been revoked (and presumable remedied) in August of 2017[, and ] revoked again four months later." Commonwealth's Br. at 29-30. The Commonwealth argues we should "presume" Barnett resolved the issues with his license in 2017, which allegedly "shows [Barnett] was aware of the first license revocation, allowing the court to infer that he was receiving proper notice of his status of his license." *Id.* at 30. The Commonwealth, however, presented no evidence to support a finding that, even if he had received notice of and fixed the first revocation, he was aware of the second one.

The Commonwealth further claims we should view the concealment of the firearm and his flight as indicative of consciousness of guilt. However, the license at issue is a license to carry the firearm concealed on his person. Therefore, if a person believed he had such a license, carrying a concealed firearm would not indicate consciousness of guilt. Further, additional crimes occurred on the night of the arrest, and the Commonwealth provides no

_____

> appellant was aware of the fact that his license had been revoked and that he no longer possessed a valid license to carry.

Tr.Ct.Op. at 6 (unpaginated).

reason why his flight would be based on the concealed firearm rather than the other crimes.

Because the Commonwealth presented no evidence regarding Barnett's knowledge of the revocation of the license to carry a firearm, we conclude it failed to establish, beyond a reasonable doubt, that Barnett acted intentionally, knowingly, or recklessly, with respect to the element that requires that Barnett have a license to carry a firearm.

Judgment of sentence affirmed in part and reversed in part. Case remanded for resentencing. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 1/30/2025