J-S54027-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| TIMOTHY POUGH | : | |
| | : | |
| Appellant | : | No. 2082 MDA 2019 |

Appeal from the Judgment of Sentence Entered October 30, 2019
In the Court of Common Pleas of York County Criminal Division at No(s):
CP-67-CR-0000809-2019

BEFORE: NICHOLS, J., McLAUGHLIN, J., and MUSMANNO, J.

MEMORANDUM BY McLAUGHLIN, J.:                    **FILED MARCH 25, 2021**

Timothy Pough appeals from the judgment of sentence entered on October 30, 2019, following his conviction for First-Degree Murder. He challenges the sufficiency of the evidence to support a finding of specific intent to kill. We affirm.

Pough was in a relationship with Tyeesha Coleman, and after the relationship ended, on July 4, 2018, Pough went to Coleman's home and fired multiple shots into her car. Coleman was not in the car at the time, but her younger brother, Elijah Shuler, was. Pough's gunfire struck and killed Shuler. Police arrested Pough and charged him with First- and Third-Degree Murder. The trial court summarized the evidence at trial as follows:

> Tyeesha Coleman, called to testify, told the jury that Elijah Shuler was her little brother. Ms. Coleman and the Appellant, Timothy Pough, were in a relationship together for some time. Ms. Coleman indicated that her brother had seen [Pough] before, but that Mr. Shuler did not know

[him]. Ms. Coleman and [Pough's] relationship ended sometime in June of 2018. Ms. Coleman testified that she had seen [Pough] on July 2, 2018 while she was in her car. At the time, Ms. Coleman was in her, then blue 2015 Hyundai Elantra with her two daughters. [Pough] prevented Ms. Coleman from driving away and then he tapped on her window with a gun before telling her that when he caught her by herself then he was going to kill her. Ms. Coleman described the gun as a "little black gun." Two days later, on July 4, 2018, Ms. Coleman was inside of Maribel[ Colon's] residence with Maribel, Margarita [Colon], and all of their children. Elijah Shuler was outside. Ms. Coleman stated that they heard gunshots and that, when they ran to her nephew's window, they saw [Pough] shooting into Ms. Coleman's car. Ms. Coleman testified that her brother, Elijah, had been in her car and she observed [him] running away from it. [Pough] was observed to have been in the rear passenger seat of a white Jeep. Ms. Coleman described how she had been able to see [Pough] with a black gun. [Pough's] vehicle was seen to stop during the shooting, [Pough] never exited the vehicle, and then [Pough's] vehicle drove away. Elijah ran to the doorway of the residence where he collapsed while trying to communicate that [Pough] had shot him. Elijah then expired. Upon the arrival of the police, Ms. Coleman informed them that she had seen the driver whom she recognized as someone by the name of Taria and, despite not knowing the make of the vehicle, she described the assailant's vehicle. Ms. Coleman then described how her vehicle had been repaired and how the windows, which were not tinted at the time of the shooting, were now tinted. Ms. Coleman stated that it was still light out at the time of the shooting.

Margarita Colon took the stand and testified that Elijah Shuler had been her boyfriend. On the date in question, Ms. Colon was at her sister Maribel's home at 939 West Locust Street. Mr. Shuler had been present, but he left in Tyeesha Coleman's vehicle. Mr. Shuler had called and told Ms. Colon that he was out back and then Ms. Colon heard shots ring out. Ms. Colon saw a white Ford Escape driving away. Ms. Colon described seeing [Pough] and a person she knew as Taria inside of the vehicle. The shooting victim attempted to gain the stairs to the kitchen; however, he collapsed and uttered the name of "Reek," which Ms. Colon stated was the

name that [Pough] goes by. Ms. Colon described the weather as nice out - still daytime.

Taria Bolyard was called as a witness and she testified that she had known [Pough] through mutual friends for a few years. She stated that [Pough] was known by the name "Reek." On July 4, 2018, Ms. Bolyard saw [Pough] at a friend's home on Philadelphia Street. Ms. Bolyard testified that, around 7:00, she left to go to the store and that [Pough] desired to go with her. Ms. Bolyard then drove [Pough] in her white Ford. Ms. Bolyard stated that [Pough] was in the front passenger seat and that he asked for her to make a detour. [Pough] told Ms. Bolyard that he wanted to see his ex. Once driving up the alleyway behind the houses on Locust, [Pough] asked Ms. Bolyard to slow down and then she heard shots. Ms. Bolyard then took off. Ms. Bolyard realized [Pough] had a gun when she saw him draw his arm back through the window of her vehicle. There was no conversation and then Ms. Bolyard pulled over and dropped [Pough] on Princess Street per his request. Ms. Bolyard parked her car on Philadelphia Street and she was subsequently taken into custody by detectives. On cross-examination, the defense elicited that Ms. Bolyard had told the police that she believed [Pough] was going to shoot out the tires because that is what he had told her he intended to do. Also, on cross-examination, Ms. Bolyard indicated that she had not seen anyone in the vehicle in question; however, during the redirect, Ms. Bolyard stated that she had not seen the blue Hyundai, nor had she looked for it.

Officer Galen Detweiler was called to testify and he stated that he responded to the residence and collected evidence. Officer Detweiler described the locations of bullet holes on the Hyundai, which included one that damaged a window.

Detective Christopher Perry took the stand and described the processing of the Hyundai. Detective Perry opined that his analysis revealed that the Hyundai had been struck four times by bullets, including the passenger side rear door. The detective described how one bullet passed through a child's car seat. A bullet passed through the passenger side front seat. The detective described what he believed to have been high impact blood splatter on the dashboard of the passenger side of the vehicle. During Detective Perry's testimony the following exchange occurred:

Perry: Based on my processing of the vehicle, inside and out, every nook and cranny that I would work through on that car, I believe No. 1, which I identified as being No. 1, came through the rear glass, came towards the passenger side compartment of the vehicle, Nos. 2 and 3, again same thing. Based on Strike No. 5, which was to the passenger side rear door, Strike No. 6, which was below your C post in the actual molding of the vehicle itself, and then No. 4, which is right here, which came directly through the backseat, through No. 8, went through No. 10, and then went through No. 11. And the final evidence of that bullet, I believe, was that high impact spatter, blood spatter, that I took from No. 12, which was on the passenger side dashboard of the vehicle.

Cmwlth: So, following the trajectory as you determined, based on your observations and processing, what seat in the car were those shots aimed at?

Perry: The passenger side.

Detective Timothy Shermeyer was called to the stand and he described how the firearm was searched for but never located. An arrest warrant was issued for [Pough] and the search was turned over to the U.S. Marshall Fugitive Task Force. [Pough] was apprehended in Florida.

[Pough] took the stand and testified that he asked Taria Bolyard to take him to the store and to see his ex-girlfriend, Tyeesha Coleman, at 939 West Locust Street. [Pough] testified that his objective was to destroy Ms. Coleman's vehicle. [Pough] indicated that Ms. Coleman's Hyundai was not running when he and Ms. Bolyard pulled into the alleyway. [Pough] confessed to shooting into the rear of the vehicle; however, he claimed that he did not see Mr. Elijah Shuler inside of the vehicle. On cross-examination [Pough] stated that while he had told Ms. Bolyard he wished for her to take him to see his ex-girlfriend, he did not actually go looking for her or anyone else. [Pough] admitted to telling Ms. Bolyard that he wanted to go see his ex-girlfriend. [Pough] admitted that none of the shots were aimed at the tires, that one shot was around the middle of the car, that one shot was a little lower, and that the last shot was higher

- 4 -

up and through the back window. [Pough] claimed that his eyes were shut during the shooting.

Trial Court Opinion, filed 5/7/2020, at 2-7 (citations to the trial transcript omitted and emphasis removed).

A jury found Pough guilty of First-Degree Murder. The court sentenced him to life without the possibility of parole. After the trial court denied his post-sentence motion, this timely appeal followed.

Pough raises one issue for our review:

> Did the [t]rial [c]ourt err when it upheld the sufficiency of the evidence in this case to convict [Pough], when the Commonwealth could not establish the requisite intent as the person whom the Commonwealth alleged [Pough] was trying to kill was not in the area of the alleged shooting, at the time that [Pough] allegedly shot into the automobile in question[?]

Pough's Br. at 5.

When reviewing a challenge to the sufficiency of the evidence, our standard of review is *de novo*, while "our scope of review is limited to considering the evidence of record, and all reasonable inferences arising therefrom, viewed in the light most favorable to the Commonwealth as the verdict winner." **Commonwealth v. Rushing**, 99 A.3d 416, 420-21 (Pa. 2014). "Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt." **Commonwealth v. Widmer**, 744 A.2d 745, 751 (Pa. 2000). The Commonwealth may sustain its burden by means of wholly circumstantial evidence. **Commonwealth v. Dix**,

207 A.3d 383, 390 (Pa.Super. 2019). Further the trier of fact is free to believe, all, part, or none of the evidence presented when making credibility determinations. *Commonwealth v. Beasley*, 138 A.3d 39, 45 (Pa.Super. 2016) (citation omitted). "[T]his Court may not substitute its judgment for that of the factfinder, and where the record contains support for the convictions, they may not be disturbed." *Commonwealth v. Smith*, 146 A.3d 257, 261 (Pa.Super. 2016).

Pough argues there was insufficient evidence to prove that he had the specific intent to kill, as is necessary to support a conviction for First-Degree Murder. He concedes that the killing of Shuler was unlawful and that he was responsible for the shooting, but argues that the evidence was insufficient "to demonstrate that when he fired into the car, he was doing so with the intent to kill Ms. Coleman, and while doing so killed Mr. Shuler." Pough's Br. at 11-12. He cites prior decisions in which Pennsylvania courts sustained First-Degree Murder convictions on a theory of transferred intent, and states that a "common element" among those cases is that the intended victim "was present in the area where the shooting occurred." *Id.* at 18. Pough claims that no cases hold that specific intent to kill transfers to an accidental victim where the intended victim is not present at the scene of the killing. He argues that because Coleman testified that she was in the house, and not in the car, the evidence was insufficient here.

Conversely, the Commonwealth argues that there was sufficient evidence presented at trial to find Pough guilty beyond a reasonable doubt of

First-Degree Murder. The Commonwealth maintains that Pough, following through on his threat, shot into Coleman's car with the intent to kill her, and that intent transferred to the victim, Shuler. It asserts that Coleman's proximity was not necessary to transfer Pough's intent to kill, because proximity is not an element of transferred intent.

"A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing." 18 Pa.C.S.A. § 2502(a). The elements of First-Degree Murder are as follows: "(1) a human being was unlawfully killed; (2) the defendant was responsible for the killing; and (3) the defendant acted with malice and a specific intent to kill." *Commonwealth v. Padilla*, 80 A.3d 1238, 1244 (Pa. 2013).

The doctrine of transferred intent "provides that if the intent to commit a crime exists, this intent can be transferred for the purpose of finding the intent element for another crime." *Commonwealth v. Gibbs*, 626 A.2d 133, 138 (Pa. 1993) (citation omitted). The transferred intent doctrine is codified in 18 Pa.C.S.A. § 303 and reads in relevant part as follows:

> **(b) Divergence between result designed or contemplated and actual result.** – When intentionally or knowingly causing a particular result is an element of an offense, the element is not established if the actual result is not within the intent or the contemplation of the actor unless:
>
> (1) The actual result differs from that designed or contemplated as the case may be, only in the respect that a different person or different property is injured or affected or that the injury or harm designed or contemplated would have been more serious or more extensive than that caused.

18 Pa.C.S.A. § 303(b)(1). Section 303 provides that transferred intent can apply if the only difference is that the contemplated action affects "a different person or different property" other than the one intended. It establishes a causal relationship between conduct and result.

There was ample evidence that Pough specifically intended to kill Coleman, and to transfer that intent to Shuler. Coleman testified that two days prior to the shooting, Pough threatened her life. N.T., 9/9/19-9/11/19, at 97. According to her statement, Pough waited for her to pull up in front of her family member's home, stopped her from driving away, tapped on her window with a gun and threatened that he was going to kill her the next time he saw her alone. *Id.* Subsequently, two days later Pough followed through on his promise. He went to the same house with a loaded gun and shot four times into the same car. *Id.* at 100, 268. However, Shuler – not Coleman – was struck as he sat alone in the passenger seat of Coleman's car. *Id.* at 101.

The trial court concluded that the intent to commit First-Degree Murder transferred to the killing of Shuler. Trial Ct. Op., at 11. The court noted that proximity is not an element of a transferred intent prosecution. *Id.* at 10-11. The trial court further addressed the proximity issue by quoting *Commonwealth v. Williams*, 615 A.2d 716, 727 (Pa. 1992):

> One who intentionally kills, but whose fatal blow falls on a mistaken victim, is if anything **more** culpable than murderers who do not carelessly kill innocent bystanders. This type of murder, is unquestionably not merely "fortuitous" . . . . It is not the product of chance or accident. Nor is it unforeseeable, unexpected or without known cause, but rather, it is the product of a heart turned not only

against the intended victim but also against all those anonymous but within range of the murder weapon.

*Id.* at 10 (emphasis in ***Williams***).

Neither the plain language of Section 303 nor the First-Degree Murder statute includes a "proximity" requirement. Proximity – or not – was only one of many pieces of evidence that the jury had before it. The trial judge instructed the jury that they were free to draw a reasonable inference of intent "from the facts and circumstantial evidences, including [Pough's] actions and conduct." N.T., 9/9/19-9/11/19, at 311.

The total facts and circumstances here support the jury's finding of guilt. The jury considered all of the evidence, and determined that Pough believed Coleman was in proximity, when he shot into her car, because it believed Pough could see that someone was sitting in the passenger seat. The evidence showed it was still light out. *Id.* at 108. A witness said that it had not begun to rain yet. *Id.* at 110. It was clear enough for the witnesses to identify Pough from a second story window. *Id.* at 100, 105. The passenger window was visible as Pough approached the vehicle. *Id.* at 206. None of the shots were aimed at the tires. *Id.* at 278. Detective Perry testified that the bullets were aimed specifically at the passenger seat. *Id.* at 175. The distance from Pough to the back of the car was eleven and a half feet. *Id.* at 276. The victim himself was able to identify the shooter, even though he had the worst vantage point of all, sitting with his back towards Pough. *Id.* at 106. The Commonwealth opined that the final bullet was aimed higher, just as witnesses testified that Shuler was attempting to escape the vehicle. *Id.* at 297.

The jury looked at the totality of the evidence and circumstances, including Pough's threat two days prior when he said he was going to kill Coleman the next time he caught her alone, while he brandished a gun. *Id.* at 97. Pough then brought a loaded gun to the place he knew Coleman frequented, while she was in the proximity of her car, watching at least part of the shooting from an upstairs window. *Id.* at 100. The angle of Pough's approach and the clear weather supported the inference that he could see someone was in Coleman's car. *Id*. at 108, 206*.* The trajectory evidence showed that he aimed for that person in the passenger seat. *Id.* at 206.

We conclude that the evidence was sufficient to establish that Pough committed the offense of First-Degree Murder when he specifically planned and attempted to kill Coleman, and that the specific intent transferred when Pough knowingly fired at the person in her parked car and killed him. Therefore, we reject Pough's claim.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 03/25/2021