J-S16012-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JONATHAN WESLEY HARRIS | : | |
| | : | |
| Appellant | : | No. 1544 EDA 2020 |

Appeal from the Judgment of Sentence Entered August 6, 2019
In the Court of Common Pleas of Montgomery County Criminal Division
at No(s):  CP-46-CR-0006807-2018

BEFORE:   BENDER, P.J.E., McLAUGHLIN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY BENDER, P.J.E.:                    **FILED JULY 27, 2021**

Appellant, Jonathan Wesley Harris, appeals *nunc pro tunc* from the August 6, 2019 judgment of sentence of life imprisonment, followed by a consecutive term of 22½ to 45 years' incarceration, imposed after a jury convicted him of first-degree murder, kidnapping, strangulation, and possessing an instrument of crime.  On appeal, Appellant alleges that the trial court erred by not instructing the jury on voluntary manslaughter, and that the evidence was insufficient to sustain his kidnapping conviction.  We affirm.

Appellant's convictions stemmed from the following facts, which we summarize from the trial court's more detailed discussion in its Pa.R.A.P. 1925(a) opinion.  **See** Trial Court Opinion (TCO), 10/27/20, at 1-8.  On August 22, 2018, at approximately 9:15 p.m., police conducted a welfare check on

_____

[*] Former Justice specially assigned to the Superior Court.

the victim in this case, Christina Kraft. After forcing their way into the victim's locked apartment, police discovered her body lying on her bed. The victim's hair and head were covered with blood, and rigor mortis had set in. Through surveillance videos, police discovered that Appellant had entered the victim's apartment building with her at 3:06 a.m. on August 22, 2018, and he had exited the building from the back door at 5:19 a.m.

Appellant was ultimately arrested as a suspect in the victim's murder. During an interrogation after his arrest, Appellant provided the following confession to murdering Kraft:

[Interrogator]: Did you kill Christina Kraft?

[Appellant]: Yes.

[Interrogator]: Do you recall the events inside of [the victim's] apartment?

[Appellant]: Yes.

[Interrogator]: Do you recall arriving at [the victim's] apartment with her?

[Appellant]: Yes.

*** 

[Interrogator]: What happened when you got inside of [the victim's] apartment?

[Appellant]: I had almost an ounce of cocaine on me, powder cocaine. Part of the reason we went back there was so that she could pay me for the cocaine. We were also going to have sex. So when we arrived, we started drinking wine. We drank like three bottles of wine. After we had the wine[,] we had sex. This was the problem. She thought that because she had sex with me[,] she didn't have to pay me for the cocaine. I was trying to get $1,200 from her for the cocaine, but she refused to pay me. I kept asking her to pay me and she wouldn't. I was mad[]

- 2 -

because she had already taken the cocaine at that point. She put it somewhere in the house and [I] didn't know where she had put it. We started arguing about the money. She started getting loud and screaming. She was telling me to get out, that she was going to call the police. She grabbed some glass bottle and hit me in my left ear. It made me bleed. She was screaming, "Get out." I slapped her in the face[,] and she fell to the floor. We were in the hallway at that point.

[Interrogator]: After you slapped her, what happened?

[Appellant]: We had been there for about an hour and a half already at this point. I picked her up and walked her into the bedroom and put her on the bed. I'm panicking. She's naked and I had my white pants on. She was trying to recover from the blow I delivered to her. When she recovers from the blow[,] she begins screaming at the top of her lungs. I punched her in the face and begged her to be quiet. I told her that I didn't want to hurt her. When I punched her, she got quiet. She kind of went unconscious. As she was lying on the bed[,] I tied her hands up with a pair of pajama pants. I tried [*sic*] her hands so she couldn't fight back or hit me.

[Interrogator]: What happened next?

[Appellant]: She started taking [*sic*] reasonable for a few minutes. I told her I was scared and I just wanted to get out of there. I untied her and she was pretending to cooperate, and then she jumped off the bed and tried to run for the door. I grabbed her and threw her back on the bed. I punched her in the face again with my left hand and then my right hand. I hit her hard. My intention was to knock her unconscious. I did knock her out. She was unconscious on the bed and bleeding profusely. That's when I started looking thought [*sic*] her house for my cocaine. I found it hidden in her jewelry box in her bedroom.

[Interrogator]: After you found that, what did you do?

[Appellant]: I was looking for the money she had, but didn't find any. She was laying [*sic*] on the bed like breathing funny. I was panicking. I didn't know if I should burn the house down or what. I turned her over on her stomach. Blood was coming out of her mouth. She said to me, "I'm fine. I just want to use my phone to call my father." I went and got her phone from the living room and I handed it to her. When I handed her the phone, started calling the police. I saw her start to dial 911. She got the nine.

- 3 -

I grabbed her phone and threw it[,] and I began choking her and pushing her on the bed while choking her. When I let go of her, that's when I left her. When I let go she was still breathing, but she wasn't fighting anymore, either.

TCO at 5-7 (quoting N.T. Trial, 5/8/19, at 227-31). At trial, the Commonwealth presented evidence that the victim had bone fractures and other injuries concentrated around her head and neck, and that her manner of death was ligature strangulation.

On May 6, 2018, Appellant's four-day jury trial commenced. At the conclusion thereof, he was found guilty of the offenses stated *supra*. On August 6, 2019, the court sentenced Appellant to the aggregate term set forth above. Appellant filed a notice of appeal on October 10, 2019, which this Court quashed as untimely on July 20, 2020. On July 28, 2020, Appellant filed a petition under the Post Conviction Relief Act, 42 Pa.C.S. §§ 9541-9546, seeking the restoration of his appeal rights. On August 10, 2020, the court granted Appellant's petition, and he filed the present, *nunc pro tunc* appeal on August 11, 2020.

The trial court subsequently ordered Appellant to file, and serve on the court, a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal by September 29, 2020. According to the court, Appellant "forwarded [his Rule 1925(b) statement] to [c]hambers on September 24, 2020." TCO at 8. However, it seems that Appellant did not file his concise statement until October 27, 2020. Notwithstanding Appellant's untimely filing of his Rule 1925(b) statement, we will consider his issues on appeal, as the trial court addressed them in its opinion. *See **Commonwealth v. Burton***, 973 A.2d

428, 433 (Pa. Super. 2009) (holding that where an appellant files an untimely Rule 1925(b) statement, "this Court may decide the appeal on the merits if the trial court had adequate opportunity to prepare an opinion addressing the issues being raised on appeal").

Herein, Appellant states the following issues for our review:

I. Did the trial court err in failing to give a provocation/voluntary manslaughter instruction to the jury?

II. Was the evidence insufficient to establish kidnapping since:

(1) There was insufficient evidence of the following element: "he unlawfully removes another a substantial distance under the circumstances from the place where he is found, or if he unlawfully confines another for a substantial period in a place of isolation." 18 Pa.C.S. § 2901…[.]

(2) Additionally, [Appellant's] actions did not constitute kidnapping because any confinement was incidental to the core crime of murder?

Appellant's Brief at 3.

In Appellant's first issue, he avers that the trial court erred by denying his request for a jury instruction on voluntary manslaughter. He insists that such an instruction was warranted because "the killing occurred after defendant had consumed a large quantity of alcohol and drugs. Further, shortly before the killing[, Appellant] and the [victim] had engaged in a heated altercation in which the [victim] struck [Appellant] in the left ear with a glass bottle." *Id.* at 14.

As the trial court aptly explained:

The relevant inquiry for [an] appellate court when reviewing a trial

- 5 -

court's failure to give a jury instruction is whether such charge was warranted by the evidence in the case. ***Commonwealth v. Baker***, 963 A.2d 495[, 506] (Pa. Super. 2008) [(citations omitted)]. Additionally, the Pennsylvania Superior Court has stated:

> In reviewing a challenge to the trial court's refusal to give a specific jury instruction, it is the function of this Court to determine whether the record supports the trial court's decision.  In examining the propriety of the instructions a trial court presents to a jury, our scope of review is to determine whether the trial court committed a clear abuse of discretion or an error of law which controlled the outcome of the case.  A jury charge will be deemed erroneous only if the charge as a whole is inadequate, not clear or has a tendency to mislead or confuse, rather than clarify, a material issue.  A charge is considered adequate unless the jury was palpably misled by what the trial judge said or there is an omission which is tantamount to fundamental error.  Consequently, the trial court has wide discretion in fashioning jury instructions.  The trial court is not required to give every charge that is requested by the parties and its refusal to give a requested charge does not require reversal unless the appellant was prejudiced by that refusal.

***Id.*** at 507 (quoting ***Commonwealth v. Brown***, 911 A.2d 576, 582-[]83 (Pa. Super. 2006)).   Moreover, the Pennsylvania Supreme Court has explained, with respect to a "heat of passion" voluntary manslaughter instruction:

> A voluntary manslaughter instruction is warranted only where the offense is at issue and the evidence would support such a verdict.  To support a verdict for voluntary manslaughter, the evidence would have had to demonstrate that, at the time of the killing, [the] appellant acted under a sudden and intense passion resulting from serious provocation by the victim.  If any of these be wanting-if there be provocation without passion, or passion without a sufficient cause of provocation, or there be time to cool, and reason has resumed its sway, the killing will be murder.

***Commonwealth v. Sanchez***, 82 A.3d 943, 979-80 (Pa. 2013) (internal quotation marks and citations omitted).

'Heat of passion' includes emotions such as anger, rage, sudden resentment or terror which renders the mind incapable of reason. An objective standard is applied to determine whether the provocation was sufficient to support the defense of 'heat of passion' voluntary manslaughter. The ultimate test for adequate provocation remains whether a reasonable man, confronted with this series of events, became impassioned to the extent that his mind was incapable of cool reflection.

*Commonwealth v. Miller*, 987 A.2d 638, … [6]50 (Pa. 2009) (internal quotation marks and citations omitted).

TCO at 9-11.

The trial court then explained the basis for its decision to deny Appellant's request for a voluntary manslaughter jury instruction:

This [c]ourt made its ruling that it would not be giving the jury the voluntary manslaughter instruction, finding that as a matter of law, that no reasonable person confronted with the series of events that Appellant was confronted with, according to his confession to police, would become so impassioned to the extent that his mind was incapable of cool reflection. Sufficient evidence did not exist to submit provocation and sudden intense passion to the jury. On the night of the murder, nothing occurred that could arguably constitute provocation sufficient for a voluntary manslaughter instruction. The defense position, relying on Appellant's confession to police, was that Appellant became impassioned when an argument broke out between two very intoxicated people, over a drug debt[,] and that the victim threw a wine bottle at Appellant[,] which hit him on the ear. Even assuming all this to be true, applying the objective standard, this [c]ourt determined that as a matter of law this was not sufficient provocation at the time of the killing, and that this did not rise to "sudden and intense passion resulting from serious provocation by the victim."

In addition, again, according to Appellant's own confession, he was capable of cool reflection. Critical was that there were several breaks in the confrontation when Appellant disabled the victim by knocking her out. In fact, while the victim was knocked unconscious[,] he tied her up so that she could not fight back. This is indicative of the ability to formulate a plan and to reason.

- 7 -

It was only when the victim tried to call 911[] that Appellant strangled her.

*Id.* at 9-14 (citations to record omitted, some formatting altered).

On appeal, Appellant does not respond to the trial court's analysis. Notably, he makes no mention of the court's conclusion that there was a sufficient "cooling off" period between the victim's hitting him with a wine bottle and his strangling her. Instead, Appellant argues only that his case is identical to **Commonwealth v. Harris**, 372 A.2d 757 (Pa. 1977). There, our Supreme Court concluded that a voluntary manslaughter instruction was warranted because the evidence showed that, as the victim and Harris were arguing, the victim struck Harris with a cane, and Harris then stabbed the victim. **Id.** at 758. Because Harris "testified that he became increasingly angry at [the victim's] remarks and did not reach for his knife until after the argument started and he was struck by [the victim] with the cane[,]" our Supreme Court held that "the jury could have concluded the crime committed was voluntary manslaughter." **Id.** at 759.

**Harris** is easily distinguishable from the instant facts. In **Harris**, there was no 'cooling off' period between the victim's striking Harris, and Harris's stabbing him. Here, to the contrary, Appellant told police that after the victim hit him with the wine bottle, he punched her, carried her to the bed, tied her up, talked to her, hit her again (knocking her unconscious), searched her apartment for drugs, and then gave victim her phone. It was only when Appellant realized that the victim was attempting to call 911 that he strangled her. Because Appellant did not strangle the victim immediately after she

- 8 -

struck him with the wine bottle, his case is not identical to **Harris**.  Moreover, Appellant offers no rebuttal to the trial court's conclusion that he had sufficient time to 'cool off' before he killed the victim.  Accordingly, he has failed to demonstrate that the court abused its discretion by denying his request for a voluntary-manslaughter jury instruction.

Next, Appellant challenges the sufficiency of the evidence to sustain his conviction for kidnapping.  To begin, we note our standard of review of a challenge to the sufficiency of the evidence:

> In reviewing a sufficiency of the evidence claim, we must determine whether the evidence admitted at trial, as well as all reasonable inferences drawn therefrom, when viewed in the light most favorable to the verdict winner, are sufficient to support all elements of the offense. **Commonwealth v. Moreno**, 14 A.3d 133 (Pa. Super. 2011).  Additionally, we may not reweigh the evidence or substitute our own judgment for that of the fact finder. **Commonwealth v. Hartzell**, 988 A.2d 141 (Pa. Super. 2009).  The evidence may be entirely circumstantial as long as it links the accused to the crime beyond a reasonable doubt. **Moreno, supra** at 136.

**Commonwealth v. Koch**, 39 A.3d 996, 1001 (Pa. Super. 2011).

The offense of kidnapping is defined as follows:

> **(a) Offense defined.--**Except as provided in subsection (a.1), a person is guilty of kidnapping if he unlawfully removes another a substantial distance under the circumstances from the place where he is found, or if he unlawfully confines another for a substantial period in a place of isolation, with any of the following intentions:
>
> > (1) To hold for ransom or reward, or as a shield or hostage.
> >
> > (2) To facilitate commission of any felony or flight thereafter.

(3) To inflict bodily injury on or to terrorize the victim or another.

(4) To interfere with the performance by public officials of any governmental or political function.

18 Pa.C.S. § 2901(a).

In this case, Appellant argues that he did not hold the victim in a place of isolation, as she was inside her own condominium that "was located in a multi-unit building with a common lobby." Appellant's Brief at 18. He claims that the facts of this case are controlled by this Court's decision in **Commonwealth v. Hook**, 512 A.2d 718 (Pa. Super. 1986). There, Hook forced his way into a woman's apartment, which was located above a clothing store that was open for business at the time. **Id.** at 719. The woman escaped Hook, running into the apartment of an elderly, female neighbor. **Id.** Hook followed her and, after assaulting both women, he passed out from intoxication. **Id.** Hook was later convicted of kidnapping, but this Court reversed on appeal, concluding that the Commonwealth had failed to prove that Hook confined the women in a place of isolation. We stressed that there were three occupied apartments on the same floor, and a clothing store that was open for business on the first floor when the crime occurred. **Id.** at 720. We also observed that the "[e]ntrance to the stairway that led to the apartments was through a door which adjoined the door to the clothing store[,]" and that one victim was expecting a dry-cleaning delivery at the time Hook barged into her apartment. **Id.** These facts, we concluded, made it

- 10 -

"clear that there was open access to the area." *Id.* Thus, it was not a "place of isolation" for the crime of kidnapping.

Appellant fails to recognize that, after *Hook*, our Supreme Court decided *Commonwealth v. Rushing*, 99 A.3d 416 (Pa. 2014). There, Rushing had, *inter alia*, handcuffed and bound several victims in their own home, threatened them repeatedly to be quiet, assaulted them, and placed them all in great fear. *Id.* at 426. Our Supreme Court concluded that these facts made the case distinguishable from *Hook*, where "the mode of confinement did not render discovery or rescue of the victims unlikely." *Id.* The *Rushing* Court stressed that,

> the degree of isolation from discovery and rescue and the usual protections of society remain the touchstone in determining whether the statutory element of confinement in a place of isolation is satisfied. Applying the facts of this appeal to the definition of [`]place of isolation,['] we have no hesitancy in determining that, although imprisoned in their own home, the victims were confined by [Rushing] in a place of isolation.

*Id.*

The present case is controlled by *Rushing*, rather than *Hook*. Unlike in *Hook*, there was no open or easy access to the victim's apartment. Appellant confined the victim during the early-morning hours when no one was expected to arrive. When the victim's boyfriend attempted to enter the victim's apartment the following evening, he could not get in because the door was locked. *See* N.T. Trial, 5/6/19, at 45. Ultimately, the police had to force their way into the victim's home using a crowbar. *Id.* at 46.

- 11 -

Additionally, the victim in this case was not able to escape and flee her apartment, as the victim did in **Hook**. Instead, Appellant tied up the victim, and then punched her in the face and begged her to be quiet when she screamed. Later, when the victim tried to run for the door, Appellant dragged her back to the bed and punched her so hard she was rendered unconscious. Appellant then choked her when she tried to dial 911. These facts are similar to those in **Rushing**, and sufficiently demonstrate that Appellant caused the victim to be "separated from the normal protections of society in a fashion that makes imminent discovery or rescue unlikely." **Rushing**, 99 A.3d at 427. **See also Commonwealth v. Jenkins**, 687 A.2d 836, 839 (Pa. Super. 1996) (finding, where an elderly woman and her great grandson were held at knifepoint inside their own home for five hours, the victims were unreachable, and the fate of both victims was exclusively in the hands of defendant, the victims were effectively isolated from rescue or the usual protections of society, and, thus, were in a place of isolation); **Commonwealth v. Mease**, 516 A.2d 24, 26 (Pa. Super. 1986) (concluding the defendant's basement constituted a 'place of isolation' as the victim, being confined there for several hours, beaten, stabbed, and shot in the back of the head, had been confined where discovery and rescue were unlikely and isolated from the usual protections of society). Therefore, the Commonwealth established that

Appellant confined the victim in a 'place of isolation' so as to support his conviction for kidnapping.[1]

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/27/2021

---

[1] We decline to address Appellant's assertion that, "just as any confinement in **Hook** was incidental to the attempted rape, any confinement of the decedent in the instant case was incidental to the murder." Appellant's Brief at 18. Appellant's single-sentence argument is not sufficiently developed to warrant review. **See Commonwealth v. Hardy**, 918 A.2d 766, 771 (Pa. Super. 2007) ("When briefing the various issues that have been preserved, it is an appellant's duty to present arguments that are sufficiently developed for our review. The brief must support the claims with pertinent discussion, with references to the record and with citations to legal authorities. … [W]hen defects in a brief impede our ability to conduct meaningful appellate review, we may dismiss the appeal entirely or find certain issues to be waived.").