J-A17006-21, J-A17007-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
  :   PENNSYLVANIA
  :
  :
v.   :
  :
  :
  :
LEONALDO RIVERA   :
  :
Appellant   :   No. 1700 EDA 2020

Appeal from the Judgment of Sentence Entered May 4, 2018
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0003964-2015

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
  :   PENNSYLVANIA
  :
  :
v.   :
  :
  :
  :
LEONALDO RIVERA   :
  :
Appellant   :   No. 1701 EDA 2020

Appeal from the Judgment of Sentence Entered May 4, 2018
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0003965-2015

BEFORE: McLAUGHLIN, J., KING, J., and PELLEGRINI, J.[*]

MEMORANDUM BY McLAUGHLIN, J.:      **FILED OCTOBER 29, 2021**

Leonaldo Rivera appeals from the judgments of sentence imposed after

a jury found him guilty of First-Degree Murder, Carrying a Firearm Without a

License, and Carrying a Firearm on a Public Street or Public Property in

---

[*] Retired Senior Judge assigned to the Superior Court.

Philadelphia.[1] Rivera argues that the evidence was insufficient to sustain his conviction; that the Commonwealth improperly bolstered a witness; and that the Commonwealth committed misconduct by erroneously referring to the witness protection program. We affirm.

The trial court previously set forth the facts as follows:

> At trial, the Commonwealth presented the testimony of Philadelphia police detectives John Bartol and Thorsten Lucke, Philadelphia police lieutenant Pedro Rosario, Philadelphia police sergeant Joseph Stevenson, Philadelphia police officers Robert Flade and Christine Hilbert, deputy medical examiner Dr. Albert Chu, Leticia Buchanan of the Philadelphia police department's Firearms Identification Unit, and Aleida Garcia, Christian Ramos, Antonio Vicenty, and Valery Diaz. [Rivera] presented no evidence. Viewed in the light most favorable to the Commonwealth as the verdict winner, the evidence established the following.
>
> On the night of Friday, January 23, 2015, at approximately 9:45 p.m., Alejandro Gabriell Rojas-Garcia,[2] the decedent, contacted his college friend, Christian Ramos, to inquire whether Ramos wanted to go out for drinks later that night. At around 1:00 a.m., the two agreed to meet at the A Lounge, an after-hours club, located on Macalester Street in Philadelphia, after Ramos finished work around 2:45 a.m.
>
> > [2] Alejandro Gabriell Rojas-Garcia was also known as "Luchi."
>
> Meanwhile, on that same night, at around 11:30 p.m., Antonio Vicenty, his girlfriend, Valery Diaz, her cousin Jesenia Moreno[3] and Moreno's friend Juliana Rodriguez,[4] went to a concert at 5th and Annsbury Streets in Philadelphia. Moreno was wearing a white dress at the time. While attending the concert, the four ran into [Rivera][5] and his friends. Vicenty, Diaz, Moreno, and [Rivera] all knew each other because they had grown up in the same town. Additionally, Moreno was in a romantic relationship with

---

[1] 18 Pa.C.S.A. §§ 2502(a), 6106(a)(1), and 6108, respectively.

[Rivera]. After the concert ended, Vicenty, Diaz, Moreno, and Rodriguez went to the "A Lounge." When they arrived inside the club, they discovered that [Rivera] and his friends also had gone there from the concert.

> [3] Jesenia Moreno is also known as "Jese."

> [4] Juliana Rodriguez is also known as "Julie."

> [5] [Rivera] is also known as "Leo."

After getting off from work, Ramos arrived at the A Lounge at approximately 3:15 a.m. Ramos then entered the night club and met up with Garcia and a few other friends. While at the club, Garcia spoke to a woman in a white dress, presumably Moreno, the romantic partner of [Rivera], several times.[6]

> [6] Ramos, who testified to the interaction between Garcia and "the woman in white," did not know Moreno. However, it is a fair inference from the evidence that Moreno was the woman in the white dress Ramos was describing in his testimony.

At around 4:30 a.m., Vicenty, Diaz, Moreno, Rodriguez, and [Rivera] left the night club and began walking toward their vehicles. Minutes after, Garcia and Ramos also left the A Lounge, planning to go to another club. When they were leaving the club, Garcia offered to drive Ramos to the next club. As the friends walked toward Garcia's car, Garcia walked ahead of Ramos and began talking to several women, including the woman in the white dress to whom he had spoken throughout the night. Garcia placed his arm around the woman's waist and the two were talking and laughing. After Ramos caught up to Garcia and the woman in white, the group continued walking toward Garcia's car. As they approached Garcia's car, two men across the street began yelling at them. Someone yelled at them in Spanish, "Do you want lead?" Garcia abruptly ended his conversation with the woman, told Ramos "let's go," and the two got into Garcia's car.

As Garcia drove out of his parking spot, [Rivera] fired 14 bullets at the driver's side of Garcia's car. A bullet struck Ramos under his left arm. Garcia was struck by at least four bullets. He had wounds on the left side of his face, the left

- 3 -

side of his chest, his left thigh, his right forearm, and there was a bullet fragment injury to his left hip.

After the shooting started, Garcia's car spun out of control and crashed into a wall. As [Rivera] stood on the street and fired at Garcia's car, Vicenty stood approximately six to eight feet behind him on the sidewalk. Vicenty panicked and froze as he witnessed the shooting. Then he quickly got into Moreno's rental car, which the other three women were already in, and said, "[H]e killed him." Immediately, they left and went back to Diaz and Vicenty's home.

After the car crashed, Ramos ran back to the night club and informed the security guard on duty of what had happened. A man offered to drive Ramos to the hospital in Ramos' car. on their way to Temple Hospital, the car hit a curb and sustained a flat tire. Ramos and the man then flagged down Sergeant Joseph Stevenson on 11th and Westmoreland Street, and Sergeant Stevenson drove Ramos to the hospital, where he received treatment for his injuries. Garcia was pronounced dead at the scene from multiple gunshot wounds.

Very soon after Vicenty, Diaz, Moreno, and Rodriguez arrived home, [Rivera] showed up at the house to pick up Moreno. When he arrived, Diaz asked [Rivera] about the shooting. [Rivera] told Diaz, "I killed him," and then smiled. Shortly thereafter, Vicenty came downstairs and asked [Rivera], "what the fuck happened?" [Rivera] did not respond. About fifteen to twenty minutes later, [Rivera] left with Moreno.

[Rivera] came back to Diaz and Vicenty's house later that same morning, January 24, 2015, and again told Diaz that he "did it" and had "killed him." Shortly thereafter, Vicenty again asked [Rivera] "what the fuck happened?" and [Rivera] again did not respond.

Philadelphia police detectives conducting an investigation of the murder released surveillance footage to the news media showing one man and three women, two of whom were wearing white, leaving the night club. Diaz saw the video on the news and told Vicenty about it. After recognizing themselves in the video and learning they were both persons of interest, Vicenty and Diaz went to the police

- 4 -

station that same night. Detectives interviewed them the next morning and they identified [Rivera] as the shooter.

Trial Court Opinion, filed October 19, 2018, at 2-5 (record citations, quotations, and original brackets omitted).

The jury on May 4, 2018, convicted Rivera of the aforementioned charges in two consolidated cases. At docket CP-51-CR-0003964-2015, Rivera was convicted of aggravated assault as to Ramos; at docket CP-51-CR-0003965-2015, Rivera was convicted of First-Degree Murder and related firearms offenses. The court immediately imposed the mandatory life sentence for the murder charge. It also sentenced Rivera to a consecutive seven and a half to 20 years of incarceration for the assault, and concurrent sentences of three and three and a half to seven years of incarceration and one to two years of incarceration on the firearms charges.

Although this court quashed Rivera's initial appeals as untimely, the trial court in August 2020 reinstated his direct appeal rights *nunc pro tunc*, and Rivera again appealed. He raises the following issues:

> 1. Whether the evidence at trial was sufficient to support a conviction for First Degree Murder insofar as there was no evidence from which a jury could conclude that Leonaldo Rivera acted with the specific intent to kill and mens rea beyond a reasonable doubt?
>
> 2. Whether the Court abused its discretion in overruling objections to the prosecutor's questions which improperly bolstered the credibility of Antonio Vicenty and invited the jury to speculate without evidentiary support that Mr. Rivera threatened, intimidated or attempted to harm the Commonwealth's witnesses?

3. Whether Mr. Rivera was denied a fair trial because the prosecutor's closing argument concerning the witness protection program was unsupported by the record and again invited the jury to speculate without evidentiary support that Mr. Rivera threatened, intimidated or attempted to harm the Commonwealth's witnesses?

Rivera's Br. at 9.

In his first issue, Rivera contends that there was insufficient evidence to convict him of First-Degree Murder because there was no evidence from which a jury could conclude he acted with specific intent to kill. Rivera's Br. at 16-22. He argues that, rather, the evidence at most established an intent to cause bodily harm and "mere malice." *See id.* Additionally, Rivera presents a convoluted argument that merely firing a gun into a vehicle is insufficient to prove specific intent, because the firearms statute specifically prohibits firing a gun into a vehicle and that, if doing so evinced a specific intent to kill, the firearms statute would be superfluous. *See id.*

When reviewing a challenge to the sufficiency of the evidence, our standard of review is *de novo*, while "our scope of review is limited to considering the evidence of record, and all reasonable inferences arising therefrom, viewed in the light most favorable to the Commonwealth as the verdict winner." *Commonwealth v. Rushing*, 99 A.3d 416, 420-21 (Pa. 2014). "Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt." *Commonwealth v. Widmer*, 744 A.2d 745, 751 (Pa. 2000). The Commonwealth may sustain its

burden by means of wholly circumstantial evidence. ***Commonwealth v. Dix***, 207 A.3d 383, 390 (Pa.Super. 2019). Further the trier of fact is free to believe, all, some, or none of the evidence. ***Commonwealth v. Beasley***, 138 A.3d 39, 45 (Pa.Super. 2016) (citation omitted). "[T]his Court may not substitute its judgment for that of the factfinder, and where the record contains support for the convictions, they may not be disturbed." ***Commonwealth v. Smith***, 146 A.3d 257, 261 (Pa.Super. 2016).

A conviction for First-Degree Murder requires proof beyond a reasonable doubt that the defendant acted with the specific intent to kill. ***See*** 18 Pa.C.S.A. § 2502(a); ***Commonwealth v. Padilla***, 80 A.3d 1238, 1244 (Pa. 2013). Specific intent to kill may be established from purely circumstantial evidence. ***Commonwealth v. Schoff***, 911 A.2d 147, 160 (Pa.Super. 2006).

The trial court summarized the evidence establishing Rivera's intent to kill:

> When Garcia [the victim] and his companion, Christian Ramos, got into Garcia's car and began to drive away, [Rivera] fired 14 times into the vehicle, hitting Garcia at least four times. As Garcia was driving, [Rivera] fired his shots through the driver's side of the front windshield. Two eyewitnesses, Ramos, who was sitting in the car with Garcia, and Antonio Vicenty, who was only six to eight feet from [Rivera] when [Rivera] fired his weapon, testified at trial that they saw [Rivera] firing the deadly shots into the car. According to the medical examiner, Garcia suffered wounds to the left side of his face, the left side of his chest, his left thigh, and his right forearm, and a bullet fragment injury to his left hip. The bullet to the left side of Garcia's chest hit his left lung, heart, and right lung, killing him.

***See*** Trial Court Opinion at 6-7 (citations to the record omitted).

There was evidence at trial that the victim was walking with his arm around Rivera's girlfriend, and that a short while later, Rivera fired a gun 14 times through the driver's side of the windshield of a car the victim was driving. That was enough to prove specific intent to kill. **See Schoff**, 911 A.2d at 160.

In his remaining issues, Rivera contends that he is entitled to a new trial on the basis that the prosecutor committed misconduct by improperly bolstering a witness during direct examination, and by making a reference to the witness protection program during closing argument. Rivera's Br. at 23-33. Both of these issues are waived.

To preserve an issue of prosecutorial misconduct for appeal, a defendant must make an objection and move for a mistrial. **See Commonwealth v. Jones**, 460 A.2d 739, 741 (Pa. 1983). In addition, "[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a). In both instances of alleged misconduct, Rivera made a contemporaneous objection but failed to move for a mistrial. **See** N.T., 5/1/18, at 246-47; N.T., 5/3/18, at 81-82. Accordingly, Rivera has waived these issues for purposes of this appeal. **Jones**, 501 A.2d at 741.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>10/29/2021</u>